## CARL WEIST v. FARMERS STATE BANK of Bentley North Dakota, a Corporation.

### (155 N. W. 17.)

Action for damages for alleged conversion of grain and also for alleged wrongful procurement of a real estate and chattel mortgage. Evidence examined, and *held:*

**Conversion of grain — chattel mortgage — wrongful procurement of — damages — action for — sale of grain — consent.**

1. That the plaintiff consented to have the grain sold and the proceeds delivered to the bank; therefore there was no wrongful conversion.

**Misrepresentations — reliance upon — contract — translation of interpreter — conspiracy.**

2. That there were no misrepresentations made to, and relied upon by plaintiff, by the bank or its officers. The undisputed testimony is that the bank cashier explained fully and fairly his proposition to an interpreter. This is the testimony of both the cashier and the interpreter. The only claim made by defendant is that the contract as translated to him was different. The interpreter was furnished by plaintiff himself, and there is no evidence of any conspiracy between defendant and said interpreter.

Opinion filed October 13, 1915. Rehearing denied November 29, 1915.

Appeal from the District Court of Hettinger County, *Crawford*, J. Reversed.

*Crane & Stone,* for appellant.

"The legal wrong denominated 'conversion' is any unauthorized act of dominion or ownership exercised by one person over personal property belonging to another." 38 Cyc. 2005.

A defendant cannot be held for conversion unless he had actual or constructive possession of the property. 38 Cyc. 2018B, 2; Jaggard, Torts; Frome v. Dennis, 45 N. J. L. 515.

Dominion means the right in a corporal thing, from which arises the power of disposition and of claiming it from others. 14 Cyc. 866.

An appropriation of the proceeds of the sale of a chattel which was authorized by its owner will not justify an action for conversion of the chattel. 38 Cyc. 2023, 13.

There is no evidence of fraud in this case. There is no evidence that defendant made any misrepresentation, or had any intention to deceive or defraud, or that plaintiff relied upon same to his injury. Plaintiff furnished and relied upon his own interpreter. 20 Cyc. 12 A, 123 M; Nelson v. Grondahl, 12 N. D. 130, 96 N. W. 299.

Where an instruction assumes the possible existence of a state of facts, which the jury have no right to find, there being no evidence in support thereof, reversible error is committed. Bowie v. Spaids, 26 Neb. 635, 42 N. W. 700; Crete v. Childs, 11 Neb. 252, 9 N. W. 55.

Exemplary damages cannot be given unless there is proof of actual damages, or some kind and amounts. Rev. Codes 1905, § 6562, Comp. Laws 1913, § 7145; Sonnesyn v. Akin, 14 N. D. 248, 104 N. W. 1026; 20 Cyc. 142–4.

Where fraud is involved it is the duty of the court to define and instruct upon the subject. 20 Cyc. 123 M, 127 N, and notes.

*J. K. Murray,* for respondent.

The trial court had no jurisdiction to direct copies of exhibits to be transmitted in lieu of the originals, without good cause being shown and without notice. Comp. Laws 1913, § 7822; Jasper v. Hazen, 1 N. D. 210.

32 N. D.—12.

Appellant has also failed to attach to the statement a detailed index. Rule 38 Sup. Ct. Rules, 29 N. D. XXXIX.

Appellant has failed to serve upon respondent or his attorney copies of the exhibits. Comp. Laws 1913, § 7655; 16 Cyc. 847.

Conversion consists of a positive tortious act, a wrongful detention of personal property of another, an exclusion or defiance of the owner's rights, a withholding of possession under a claim of title antagonistic to the owner. Taugher v. Northern P. R. Co. 21 N. D. 111, 129 N. W. 747.

The placing of a mortgage by one upon the crops of another is conversion. Mead v. Mead, 115 Minn. 524, 132 N. W. 1133; McDonald v. Bayha, 93 Minn. 139, 100 N. W. 679; Lee Tung v. Burkhart, 59 Or. 194, 116 Pac. 1066; Continental Gin Co. v. De Bold, 34 Okla. 66, 123 Pac. 159.

One who aids or abets a conversion is guilty of conversion. Heater v. Penrod, 2 Neb. (Unof.) 711, 89 N. W. 762; Continental Gin Co. v. De Bord, 34 Okla. 66, 123 Pac. 159.

It is the substantial injury inflicted that constitutes the gravamen of the action for conversion. State v. Omaha Nat. Bank, 59 Neb. 483, 81 N. W. 319.

Obtaining chattels by duress or fraud is conversion. 38 Cyc. 2020, 2037.

The gist of a fraudulent misrepresentation is the producing of a false impression upon the mind of the other party, and the means of accomplishing this result are immaterial. 20 Cyc. 14.

Exemplary damages may be given even though there is no actual damage, provided the surrounding circumstances warrant. Arzaga v. Villalba, 85 Cal. 191, 24 Pac. 656; Rhyne v. Turley, 37 Okla. 159, 131 Pac. 695.

The charge of the court should be read and considered as a whole. State v. Finlayson, 22 N. D. 233, 133 N. W. 298.

There is a conflict in the evidence, and this has been settled by the jury, and their verdict is binding and conclusive. Wheaton v. Liverpool & L. & G. Ins. Co. 20 S. D. 62, 104 N. W. 850.

Burke, J. Action for conversion of grain, joined with an action for damages alleged to have been sustained by reason of plaintiff being

induced to execute certain real estate and chattel mortgages. The facts leading up to the litigation are as follows: Plaintiff is a farmer of foreign birth, speaking English with difficulty. He was the owner of a government homestead upon which he resided with his family. The defendant bank owned a quarter section of land in his neighborhood, known as the David land, and in October, 1910, plaintiff called at the bank and negotiated for its purchase from one Hendricks, cashier of the bank. Hendricks did not talk German, and plaintiff, although talking some English, did not feel capable of carrying on the negotiations in that language himself, and procured one Gross to act as an interpreter. As a result of the conversation there was prepared and executed a deed from the defendant bank to plaintiff. There were also executed by the plaintiff and his wife mortgages back upon this tract for the full purchase price. At the same time there was executed and delivered to the bank by plaintiff and his wife a mortgage upon the homestead, and there was also executed and delivered to the bank a chattel mortgage upon the crops growing upon the homestead. This chattel mortgage is in error in reciting the wrong quarter of the section, but this is entirely immaterial to this lawsuit. Plaintiff insists that the mortgages were obtained by fraud, and were contrary to the agreement as he understood it. We quote briefly from his testimony:

Q. Now when Hendricks got the contract drawn up, did you ask him through Gross what was in the contract?

A. Yes, sir.

Q. Did you ask Gross to ask Hendricks what was in that contract that Hendricks had drawn up?

A. Yes, sir.

Q. Did you see Gross then speaking to Hendricks?

A. Yes, sir.

Q. Then did you see Hendricks speak to Gross?

A. Yes, sir.

Q. And what did Gross tell you then that Hendricks had said about it?

A. Just as we talked the deal over, the contract was drawn up—the team of horses that I am to give, and that is the way the contract was drawn up.

Q. Do you know how many papers you signed up that day?

A. I could not just remember.

Q. Did your wife sign a paper too?

A. Yes.

Q. Was she present all the time?

A. Yes.

Q. What did you think you were signing when you signed up those papers there?

A. I thought, just as he told me, that I was signing the contract.

Q. Contract for what?

A. For the David land.

Q. Did you think you were signing the mortgage?

A. No, sir.

Q. If you had known that the papers you were signing that day was a mortgage on your homestead would you have signed them?

A. No, sir.

Q. If you had known that these papers you were signing up that day were anything different than a contract for a sale of the David land and a chattel mortgage for two horses would you have signed the papers?

A. No.

Q. Look at your signatures thereon. Is that your signature?

A. Yes, sir.

Q. And the other one, too?

A. Yes, sir.

Q. Is that your wife's signature?

A. Yes, sir.

Q. Did you ever knowingly or intentionally sign those mortgages?

A. No, sir.

Upon cross-examination plaintiff showed considerable knowledge of English, and admitted he had been in this country seven years, and had had many business transactions, involving the giving of more than a dozen mortgages. In fact the cross-examination was conducted very largely without an interpreter. Plaintiff admitted that he had borrowed considerable money from the bank besides the transaction involving the

sale of the land, and that they held security of various kinds upon his crops. Plaintiff also admitted having procured the interpreter that was used at the time of the transaction involving the David land at the bank. Hendricks testified that he was cashier of the bank at the time mentioned, and acted for the bank in that transaction, but was not con-. nected therewith at the time of the trial. He tells a straightforward story as to the transaction. He is corroborated by the interpreter, Mr. Gross, who testifies in part as follows:

Mr. Weist came over one morning in the store and was telling he was going to buy some land from the Farmers State Bank, . . . and he wanted me to come over and talk. . . . He would have to sign those papers he said. He was going to buy a quarter of land at $2,200. I do not known just what the amount was, but he was giving a mortgage back on his homestead and a mortgage back on the place. . . . He came back in the afternoon, and he wanted me to go over and help to fix up that deal. I did not go over at first. He said I was the only one in town that could speak German and he would like to have me go over there, and so I went along.

Q. Who was present at the time you want over with Carl Weist?

A. Mr. Botten, Mr. Hendricks, Carl Weist, his wife, and myself. That is all I know. . . . Mr. Botten gave me some papers, there was some mortgages . . . there was one deed. . . .

Q. I will ask you to state whether or not you told Mr. Weist in German what the contents of these instruments were.

A. Yes, sir.

Q. And at that time did those papers that you explained, these mortgages, exhibits B and C, conform to the terms that Mr. Weist had previously told you were the terms of the purchase of that land?

A. Yes, sir.

. . . . . . . . . . . . . . .

Q. Can you state whether or not these are the notes that are signed for these exhibits?

A. Yes, sir.

. . . . . . . . . . . . . . .

Q. Did you read them and explain their contents to Mr. Weist?

A. Yes, sir.

Q. Was anything said by Mr. Weist in regard to the amounts of the notes?

A. He said there was one $800 and one $1,000 note.

Q. And you read those papers sufficiently to explain their contents for the purpose of explaining what they were about to Mr. Weist?

A. Yes, sir.

Q. Were there any other papers signed at that time?

A. Yes, sir. There was a chattel mortgage.

Q. Did you read over the chattel mortgage?

A. Yes, sir.

Q. So that the contents of that chattel mortgage were explained to Mr. Weist?

A. Yes, sir.

Whatever the transaction really was there is no dispute about the following facts: That Weist procured his own interpreter; that Hendricks made the proposition plain to Gross, the interpreter, exactly according to the notes and mortgages executed; that all of the papers were in fact executed by Weist and his wife. The only dispute that really exists is whether or not Gross, the interpreter, correctly interpreted the bank's proposition to plaintiff. In other words, the dispute is entirely between the plaintiff and his own interpreter.

The bank placed of record the various mortgages, and in the fall of 1912 attempted to collect from Weist the interest upon the various mortgages as well as the other indebtedness which Weist owed to the bank. There is not much dispute as to what happened at that time. Weist says that he raised, in 1912, 700 bushels of wheat on his homestead and 300 bushels on the David quarter. That he threshed the David quarter first, and put the grain in the bin, and then threshed his homestead and put the grain in on top of the other. That he started to haul out the wheat to an elevator where the agent's name was Huber.

Plaintiff testifies:

Q. Why did you haul it in?

A. They (the bank) told me that I had to haul it in; they got a mortgage, and if I did not they would have me locked up.

Q. Who told you that?

A. Grest (collector for the bank).

Q. Did you believe that?

A. Yes, sir.

Q. Why did you believe such a statement as that?

A. I thought it was the same as in Russia; that if I did not do it they could lock me up for it.

. . . . . . . . . . . .

Q. How many bushels of grain did you haul in to the elevator?

. . . . . . . . . . . .

A. About 800 bushels.

Q. Did you know who got the money for this grain you hauled in to the elevator?

A. The bank.

Q. Now when you came in with your first load of grain did you have a talk with the elevator man?

A. Yes, sure. I wanted the money and he would not let me have it.

Q. Well, where did he tell you to go to fix up matters?

A. I should go to Grest.

Q. Did you go to Grest?

A. Yes, sir.

Q. What did you say and what did Grest say about the grain?

A. Grest said that I could not get any money.

Q. What did he say?

A. He said they had it in mortgage.

Q. What did you say?

A. I said, "Not to my knowledge."

Q. What did you say then?

A. Sure, we have got it.

Q. What did you say then?

A. Well, then I says, "You won't let me have any money." "No, sir," he says.

Q. What did he say then?

A. I said, "Well I won't haul any more." "Well," he says, "you have got to bring it in."

Q. Well, did you get any money that day from him?

A. Five dollars cash, $5 money.

Q. Who got the grain checks that day for the grain?

A. Why, he gave me a receipt. I went out to Huber and Huber wrote out a check. I went back to the bank that day and gave it to him and he gave me $5. . . . . Huber wrote out the check and told me to go up to the bank with it, and I did go to the bank, and he told me that that fellow would accept that check.

.    .    .    .    .    .    .    .    .    .    .    .

Q. Now did you ever get any more out of that grain than the $5?

A. Yes, $15 more, he gave me.

Q. Who gave you that?

A. Grest.

Q. When did he give you this $15? That same time you got the $5?

A. No, it was afterwards—three or four days afterwards.

Upon cross-examination he admitted that he owed the bank, outside of the land contract.

Q. Do you know how much you owed the Bentley State Bank outside of the land contract in 1912?

A. One hundred and twenty-five dollars on the seed grain, and $132 on the horse and then a few small items—$10, the small notes that I borrowed in 1911.

Q. And 1912?

A. In 1912, I did not borrow any money, outside of $135.

Q. Have you any idea how much it was that you borrowed in 1911 in these small amounts?

A. It was around $30. I am not quite sure.

Q. And did you get your note back for the $125 you gave receipt?

A. I think I got a note that size, but am not quite sure.

Q. And did you get a note for $132 that you gave for the horse?

A. No, not that I remember.

Q. You would remember it, Carl, wouldn't you, if you had or had not?

A. No.

Q. When was it that you got the $125 note—after they took your wheat?

A. It was around that time.

Q. And they did not give you any other note than the $125 note when you took your wheat?

A. And the small notes. . . . I think I hauled the wheat in about a week.

Q. You hauled it all to the Huber elevator?

A. Yes.

Q. You just hauled it in there, and he weighed it and you drove away?

A. Yes, sir.

Q. How long after you brought in the first load was it that you had this talk with Grest?

A. It was the same day.

Q. And after you hauled in the first load did anybody tell you to haul it in?

A. Yes.

Q. Who?

A. Grest.

Plaintiff brings this action, as we have stated, on two counts: First, he seeks to recover damages in the sum of $600 for the value of the grain which he claims the bank converted, together with $400 exemplary damages. Second, he seeks to recover damages for the wrongful and fraudulent procurement of the mortgage upon his homestead whereby he claims he has been damaged in various sums including such items as the following: "That by reason of the aforesaid promise of plaintiff he has been unable to obtain credit or money; that he has been unable to properly farm his land; that he has been unable to obtain the necessaries of life for himself, wife and children; he has suffered damages in property or personal rights in the sum of $5,000." These and various other items of like nature run the damages claimed to the sum of $12,500, for which relief is prayed. At the close of plaintiff's case, and again at the close of the trial, defendant moved for a verdict in his favor upon the grounds that the undisputed evidence shows as

to the first cause of action there was a delivery of the grain to the elevator and payment therefor from the proceeds to the defendant bank with plaintiff's knowledge and consent, and therefore the action of conversion will not lie. As to the second cause of action, that the undisputed evidence shows a contract evidenced by the various mortgages, superseding all oral negotiations,—which were assented to by the plaintiff as his free and voluntary act, after an investigation by his own interpreter. Those motions were denied and this appeal results.

(1) We will not repeat the evidence above set forth but merely refer to it. From a perusal thereof it is evident that the grain in question was hauled to the elevator and the proceeds paid to the bank after an agreement to that effect had between Weist and the bank. Having consented to this transaction, he cannot now urge conversion by the bank. See 38 Cyc. 2023. The evidence shows that the bank had a seed lien upon some of the grain and upon some also a chattel mortgage, which read upon the S. W. ¼ section 8, whereas plaintiff's homestead was the S. E. ¼ of that section. We do not believe that plaintiff should take advantage of this mistake, however, but the matter is not material. Plaintiff having consented that the grain be sold and the proceeds delivered to the bank, it removes all possibility that the same was wrongfully converted. Gaertner v. Western Elevator Co. 104 Minn. 467, 116 N. W. 945. In reaching this conclusion we do not go to the trouble of setting out defendant's version of the conversation. We accept that of the plaintiff as correct. The court should have directed a verdict in defendant's favor upon the first cause of action.

(2) We have set out hereinbefore extracts of the evidence covering the second cause of action. As we pointed out in the statement of facts, there is nobody to contradict Hendricks' version of the contract. The offer that he made on behalf of the bank was that plaintiff should give a mortgage back upon the David quarter and also upon the homestead. This he transmitted to plaintiff's interpreter. The interpreter says that he received this offer in the exact language that Hendricks says it was given. Thus far there is no dispute. We may assume, for the purposes of this argument, that plaintiff misunderstood his own interpreter, or we may even assume that the interpreter incorrectly transmitted the message, or even intentionally misled the plaintiff. There is not the slightest evidence that defendant conspired with the inter-

preter or knew of the misrepresentation. Plaintiff relied entirely upon his own interpreter to obtain the proposition from the bank, and, having satisfied himself of the bank's proposition, accepted it. Two years elapsed before he gave any sign that he had been mistaken or deceived. We do not need to spend much time upon this proposition. To set aside the mortgages given under the sanctity of his own acknowledgment, plaintiff must show their invalidity by evidence that is clear and convincing, and that leaves no doubt in the mind of the chancellor. Jasper v. Hazen, 4 N. D. 1, 23 L.R.A. 58, 58 N. W. 454; Security State Bank v. Rettinger, 31 N. D. 240, 153 N. W. 971. In the case at bar he not only has not done this, but he has offered no evidence whatever showing fraud or deceit upon the part of the bank. The only explanation he offers is that his own interpreter must have deceived him. See 20 Cyc. 123M. It cannot be claimed that the defendant bank made a material misrepresentation to him. The evidence is uncontradicted that Hendricks made no misrepresentations whatever, either to the defendant or to his interpreter. Weist does not attempt to personally know the nature of Hendricks' language at time of contract. He does not attempt to say that it was other than given by Hendricks and Gross. Therefore, how can he say that there was misrepresentation? If plaintiff has been deceived, it is by Gross, his interpreter; and Gross is the person liable for any resultant damage, rather than the bank. The trial court should have directed a verdict for the defendant upon this cause also.

This disposes of the case, and renders it unnecessary to discuss the other errors assigned. Judgment of the trial court is reversed and the action ordered dismissed.